UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/20/2023
```

UNITED STATES OF AMERICA,

            - against -

JOSÉ SANTANA,

               Defendant.

**22 CR 368 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Defendant José Santana ("Santana") is charged with one count of possession of narcotics with intent to distribute, in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(B). Santana now moves, pursuant to the Fourth Amendment and Federal Rule of Criminal Procedure 12, for an order suppressing certain physical evidence seized during and after a search of his residence by parole and police officers, along with statements Santana made to the officers during and after the search. (See "Motion," Dkt. No. 34; "Brief," Dkt. No. 35.) Santana also seeks, in the alternative, an evidentiary hearing to resolve any disputes of material fact. (See Motion; Brief.) The Government filed its opposition (see "Opposition" or "Opp.," Dkt. No. 38), and Santana filed a reply (see "Reply," Dkt. No. 39). Upon approval from the Court, the Government filed a sur-reply. (See "Sur-Reply," Dkt. No. 40-1.) For the reasons set forth below, Santana's Motion to

suppress is **DENIED** in its entirety, and Santana's request for an evidentiary hearing is **DENIED**.

## I.   BACKGROUND[1]

On or about June 15, 2018, Santana was convicted in Bronx County, Supreme Court ("State Court") for attempted assault in the first degree, intent to cause serious injury with a weapon, in violation of New York Penal Law 120.10. The State Court sentenced Santana to 66 months' imprisonment and five years of post-release supervision.

On or about December 20, 2018, after serving six months since he was convicted, Santana was released from New York state prison, and began serving his five-year term of parole, or community supervision, with the New York Department of Corrections and Community Supervision ("DOCCS"). As part of his supervision, the New York State Division of Parole ("Parole") imposed certain conditions of release on Santana, to which he expressly agreed. These conditions include that

---

[1] Except where otherwise explicitly noted, the factual summary below is derived from the following documents, and the exhibits attached thereto: Complaint (see "Complaint," Dkt. No. 1); Memorandum of Law in Support of José Santana's Motion to Suppress Physical Evidence and Statements, dated April 21, 2023 (see "Brief," Dkt. No. 35); Memorandum of Law of the United States of America in Opposition to Defendant José Santana's Motions to Suppress, dated May 16, 2023 (see "Opposition" or "Opp.," Dkt. No. 38); José Santana's Reply to the Government's Opposition (see "Reply," Dkt. No. 39); and Sur-Reply of the United States of America to Defendant José Santana's Reply Brief (see "Sur-Reply," Dkt. No. 40-1). Except where specifically referenced, no further citation to these sources will be made.

he would "permit [his] Parole Officer to visit [him] at [his] residence" and that he would "permit the search and inspection of [his] person, residence and property." N.Y. Comp. Codes R. & Regs. tit. 9, § 8003.2; (see "DOCCS Certificate of Release," Brief, Ex. A, Dkt. No. 35-1.) After his release from custody, Santana lived with his sister, Lucy Acevedo ("Acevedo"), at her residence (the "Residence") in the Bronx, New York.

In or around early October 2021, a parole officer ("PO-1") learned that Santana had been shot while on parole. Another parole officer ("PO-2") became concerned that Santana was possibly involved in gang activity, including potential access to firearms.

Parole selected Santana's Residence for a home visit, scheduled for October 5, 2021. On or about October 5, 2021, at approximately 7:30 a.m., several Parole officers ("Parole Officers") and New York Police Department ("NYPD") officers ("Police Officers") arrived at Santana's Residence. PO-1 and PO-2 knocked on the door of the Residence, announced that Parole was there to conduct a search, and Acevedo answered the door, identifying herself as Santana's sister. Acevedo stated that Santana was not home but would return soon.

When Santana arrived at the Residence in a minivan, PO-1 explained to Santana that the Parole Officers were present

to search his Residence. The Parole Officers then placed Santana in handcuffs, and Santana told the Parole Officers that he slept in the living room of the Residence. The Parole Officers permitted Santana to sit in a chair in the living room while they conducted the search.

During the search, the Parole Officers saw a Tupperware container beneath a couch in the living room, and one of the officers approached and noticed that the container contained rice. The Parole Officers then saw a second Tupperware container along with a scale under the couch. The scale appeared to be the type of scale typically used to weigh narcotics. Santana stated that the items found under the couch belonged to him.

After opening the containers and finding what appeared to be narcotics packaged for sale, the Parole Officers informed the Police Officers of the suspected narcotics, and the Police Officers then entered the Residence. After inspecting the contents of the Tupperware packages, the officers observed glassine envelopes containing suspected narcotics.

The Police Officers explained to Santana that they wanted to search his vehicle, the minivan he drove to the

Residence, to which Santana agreed. He also provided the keys to the minivan to the Police Officers.

During the search of Santana's vehicle, the Police Officers found a walker that Santana allegedly used to walk, and a fanny pack containing suspected narcotics and Santana's identification. As a result of the search, the Parole Officers and Police Officers recovered over 1,000 glassine envelopes containing suspected narcotics, pills of suspected narcotics, and approximately five clear packages of suspected narcotics.

Santana was arrested by the Police Officers and transported to an NYPD precinct where Santana was verbally advised of his Miranda rights, waived those rights verbally, and provided a recorded post-arrest statement. According to the Government's Opposition, in this statement, Santana described shootings in his neighborhood, including an instance when he was shot three months earlier, stated he had been an active gang member, and indicated that he did not know where the recovered narcotics had come from. (See Opp. at 5.)

The NYPD laboratory (the "Laboratory") examined the suspected narcotics recovered from the Residence, assessing roughly 1,236 glassine envelopes containing a detectable amount of fentanyl and heroin. Roughly 28 tablets containing

oxycodone were seized from Santana's walker. The Laboratory also assessed glassine envelopes that contained a detectable amount of cocaine.

On or about November 29, 2021, a complaint was filed in the United States District Court, Southern District of New York, charging Santana with one count of possession with intent to distribute 40 grams or more of mixtures and substances containing a detectable amount of fentanyl, in violation of U.S.C. Sections 841(a)(1) and 841(b)(1)(B). (See "Complaint," Dkt. No. 1.) Santana was indicted on July 6, 2022 (see "Indictment," Dkt. No. 16), and he subsequently filed a motion to suppress the items seized during and after the October 5, 2021 search of his Residence and any statements Santana made to the Parole and Police Officers during and after the search.

## II.  DISCUSSION

A.  EVIDENCE OR CONTRABAND SEIZED FROM SANTANA'S APARTMENT

Santana moves to suppress any evidence of contraband seized from the Residence on or about October 5, 2021 by the Parole Officers. Santana contends that because the Parole Officers lacked an "articulable reason" to believe that criminal activity was afoot at the Residence, any evidence or

contraband seized as a result of the search of his home should
be excluded. (Brief at 4-5.)

The Fourth Amendment guarantees the right of individuals
to be free from "unreasonable searches and seizures." U.S.
Const. amend. IV. More specifically, it "protects the right
of private citizens to be free from unreasonable government
intrusions into areas where they have a legitimate
expectation of privacy." United States v. Newton, 369 F.3d
659, 664-65 (2d Cir. 2004) (citing U.S. Const. amend. IV;
Kyllo v. United States, 533 U.S. 27, 33-34 (2001)); see also
United States v. Hamilton, 538 F.3d 162, 167 (2d Cir. 2008)
("A defendant seeking to suppress the fruits of a search by
reason of a violation of the Fourth Amendment must show that
he had a 'legitimate expectation of privacy' in the place
searched.") (quoting Rakas v. Illinois, 439 U.S. 128, 143
(1978)).

As the Fourth Amendment prohibits *unreasonable* searches
and seizures, "[t]he touchstone in evaluating the
permissibility of any search is 'reasonableness.'" United
States v. Lifshitz, 369 F.3d 173, 178 (2d Cir. 2004) (quoting
Griffin v. Wisconsin, 483 U.S. 868, 873 (1987)). A reasonable
search generally "requires a warrant and probable cause," id.,

but "the law recognizes certain exceptions to this rule."
Newton, 369 F.3d at 665.

Such exceptions abound in the context of probation and
parole. The Supreme Court has held that in the context of
probation, "[a] State's operation of a probation system . . .
presents 'special needs' beyond normal law enforcement that
may justify departures from the usual warrant and probable-
cause requirements." Griffin, 483 U.S. at 873-74. Probation
is a "form of criminal sanction imposed by a court upon an
offender after verdict, finding, or plea of guilty." Id. at
874 (quoting George G. Killinger et al., Probation and Parole
in the Criminal Justice System 14 (1st ed. 1976)). While
probationers are not held in custody by the State, "they do
not enjoy 'the absolute liberty to which every citizen is
entitled, but only . . . conditional liberty properly
dependent on observance of special [probation] restrictions.'"
Id. (alterations in original) (quoting Morrissey v. Brewer,
408 U.S. 471, 480 (1972)). Because such restrictions serve
the dual purpose of achieving genuine rehabilitation and
ensuring community safety while the probationer is in the
community, supervision of probationers then constitutes a
"special need" of the State that "permit[s] a degree of

8

impingement upon privacy that would not be constitutional if applied to the public at large." Id. at 875.

The Second Circuit, quoting the First Circuit approvingly, has noted that in the context of parole,[2] "parolees enjoy even less of the average citizen's absolute liberty than do probationers" because unlike probation, "[p]arole is meted out in addition to, not in lieu of, incarceration." United States v. Grimes, 225 F.3d 254, 258 (2d Cir. 2000) (per curiam) (quoting United States v. Cardona, 903 F.2d 60, 63 (1st Cir. 1990)). Further, "[b]ecause parolees 'have fewer expectations of privacy than probationers,' the operation of a parole system is afforded at least as much discretion in this regard as the operation of a probation system[.]" United States v. Braggs, 5 F.4th 183, 187 n.3 (2d Cir. 2021) (citations omitted).

However, while "a degree of impingement upon privacy" is permitted in the context of parole, "the law requires that

---

[2] While probation and parole operate similarly and serve similar functions, some differences exist. Probation is a form of punishment that is served in place of a prison term. See Morrisey, 408 U.S. at 496 n.6 (Douglas, J., dissenting). Parole, on the other hand, "is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." Id. at 477. Thus, while probationers and parolees are both conditionally released into the community, "parolees typically will have committed more serious crimes -- ones warranting a prior term of imprisonment -- than probationers" and a state likely "has a stronger interest in supervising parolees than it does in supervising probationers." Samson v. California, 547 U.S. 843, 861-62 (Stevens, J., dissenting).

such greater intrusions occur pursuant to a rule or regulation that itself satisfies the Fourth Amendment's reasonableness requirement." Newton, 369 F.3d at 665 (internal quotation marks omitted) (quoting Griffin, 483 U.S. at 875, 873).

The Government argues that the special needs doctrine, not the "articulable reason" standard advanced by Santana and discussed below, applies to the search of Santana's Residence by the Parole Officers. In New York, whether a warrantless parole search is unreasonable and therefore violates the Fourth Amendment "must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty." Id. at 665-66 (internal quotation marks omitted) (quoting People v. Huntley, 371 N.E.2d 794, 797 (N.Y. 1977)). The special needs doctrine "permits those searches that are reasonably related to the special needs animated by management of a parole system." United States v. Rivera, No. 19 Cr. 759, 2020 WL 1131140, at *3 (S.D.N.Y. Mar. 6, 2020) (quoting Grimes, 225 F.3d at 259 n.4).

The Court is persuaded that the special needs doctrine is the appropriate standard to apply to the search at issue in this matter. There is no dispute that Santana signed a Certificate of Release, in which he expressly consented to

searches conducted by Parole. (See DOCCS Certificate of Release at 1.) The Second Circuit noted that those under supervision "who sign such documents manifest an awareness that supervision can include intrusions into their residence and, thus, have 'a severely diminished expectation of privacy.'" Newton, 369 F.3d at 665 (quoting United States v. Reyes, 283 F.3d 446, 461 (2d Cir. 2002)).

Santana argues instead that the search was unreasonable because the Parole Officers lacked "an articulable reason to suspect criminal activity in Santana's residence." (Brief at 4-5.) Though Santana does not identify the source of the "articulable reason" standard, as the Government observes, the Court finds that such a standard is likely contained within DOCCS Directive No. 9404, an internal policy memorandum that "instructs that a parole officer may conduct a warrantless search of a parolee when there is an articulable reason to conduct the search that demonstrates a risk to public safety or the parolee's re-entry into the community." Braggs, 5 F.4th at 185 (internal quotation marks and citation omitted); see also Newton, 369 F.3d at 666 (noting that New York State Division of Parole's policy manual states that "a releasee's residence may be searched only where the officer has an articulable reason for conducting the search").

11

However, the Second Circuit remarked that "[o]ur precedents make clear that only federal law applies in a federal court's exclusionary rule analysis." Braggs, 5 F.4th at 184; see also id. at 186 (noting that district court erred in applying the reasonable suspicion standard based on the DOCCS's "articulable reason" requirement "as supplying the exclusionary rule's dimensions in this federal prosecution"). Thus, it would not be proper to apply the "articulable reason" standard advanced by Santana here.

Instead, the Court applies the "special needs" doctrine, as articulated by the Supreme Court in Griffin v. Wisconsin. See 483 U.S. at 873-74. As the Court discussed above, applying the special needs doctrine in the context of parole, "a parole officer may search a parolee so long as the search is reasonably related to the performance of the officer's duties[.]" Braggs, 5 F.4th at 184.

Here, the Parole Officers searched Santana's Residence based on information that Santana had previously been shot while on parole. According to the Complaint, PO-1 learned this information and PO-2 suspected that Santana might be involved in gang activity, involving the use of firearms, which would be in contravention of the conditions of Santana's parole.

12

The Court recognizes that parole officers have a duty "to investigate whether a parolee is violating the conditions of his parole," Reyes, 283 F.3d at 459, and "to detect and prevent parole violations so as to protect the public from the commission of further crimes." U.S. v. Newton, 181 F. Supp. 2d 157, 164 (E.D.N.Y. 2002); see also Reyes, 283 F.3d at 463 ("A probation officer is responsible for ensuring that a convicted person serving a term of federal supervised release is not violating the conditions of his supervised release, which includes verifying whether the supervisee is dealing in drugs or committing other crimes.").

The Court is persuaded that the Parole Officers' search of Santana's Residence was proper because they had a duty to determine, based on information reasonably supporting their action, whether Santana was complying with his conditions of parole, which he expressly agreed to follow.

Santana argues that the search violated the Fourth Amendment because there is no evidence that the Parole Officers had knowledge or reliable tips that a parole violation occurred.[3] Santana further argues in his Reply that

---

[3] Santana also argues that the search was unreasonable because it was not incident to an arrest. (See Brief at 4-5.) However, as the Court previously addressed, the appropriate standard is that contained in the special needs doctrine. A parole search need not be incident to an arrest in order for it to be rationally and reasonably related to a parole officer's duties. See, e.g., Newton, 369 F.3d at 663, 666 (finding

the information upon which PO-1 relied provided only that Santana was shot, i.e., that he was a victim of violence, and not that he himself was perpetrating any crime. As support for his argument, Santana distinguishes <u>Braggs</u>, arguing that the anonymous tip that the parole officers received to search the parolee's home provided a specific instance of wrongdoing on the part of the parolee -- that the parolee was in possession of guns in violation of the conditions of parole. <u>See</u> <u>Braggs</u>, 5 F.4th at 188. Here, however, the information obtained by PO-1 did not concern any wrongdoing committed by Santana.

The Court is mindful that the information that the Parole Officers relied upon and that formed the basis for their search did not indicate that Santana was involved in criminal activity. Rather, that Santana was shot indicates, as he argues, that he may have been *a victim* of criminal activity. However, the Court cannot ignore certain realities that often inform police, parole, and probation officer activities, and generally provide justifiable grounds for courses of actions

warrantless safety search conducted by parole officers before any arrest was initiated to be rationally and reasonably related to an officer's duty to detect parole violations); <u>Braggs</u>, 5 F.4th at 188 (finding that search undertaken by parole officers based on anonymous tip and prior to any arrest was proper as it related to officers' duty to determine whether parolee was complying with parole conditions).

taken by law enforcement authorities. First is that Santana's underlying conviction for which he was sentenced was attempted assault with intent to cause serious injury with a *weapon*. There is no dispute that a shooting occurred. According to the Parolee Chrono Report, Santana was shot in both legs roughly several months before the search was conducted. (See "DOCCS Community Supervision Parolee Chrono Report" or "Parolee Chrono Report," Reply, Ex. A at 5-6, Dkt. No. 39-1.) Though the shooting was first reported to Parole on June 28, 2021 (see Parolee Chrono Report at 7), PO-1 did not learn of the shooting until early October 2021, and the search took place promptly on October 5, 2021. But, the fact that Santana was shot cannot be viewed in isolation from Santana's underlying conviction, which involved the use of a weapon. It would be reasonable that a parole officer would probe further into whether a supervisee who was shot may have violated his conditions of parole or may be engaging in criminal activity. Further, Santana being the victim of a shooting raises the specter of potential misconduct when considered in the context of his prior conviction for similar unlawful activities. Investigation of the circumstances of Santana's being shot is a natural and foreseeable consequence of the shooting itself. As the Complaint indicates, PO-2 was

15

concerned that Santana may have been engaged in gang activity with access to firearms. (See Complaint ¶ 4.d.) On the other hand, had the Parole Officer learned of the shooting but declined to take any further investigative steps, such conduct could possibly be viewed as constituting lack of due diligence on the part of the Parole Officer.

Santana also argues that the search was unreasonable because the Parole Officers handcuffed Santana while they conducted the search. Santana asserts that the law does not permit Santana being handcuffed based on his status as a parolee. The Government counters that the Parole Officers acted reasonably because they were permitted to handcuff Santana for safety reasons, specifically where, as here, Santana was suspected of unlawfully possessing, using, or having access to firearms. The Court is persuaded that the handcuffing of Santana was not improper, nor did it render the search unlawful as handcuffing the parolee is consistent with the protocol of Parole. (See Complaint ¶ 4.i); see also United States v. DeJesus, 538 F. Supp. 3d 382, 386 (S.D.N.Y. 2021) (noting that placing parolee in handcuffs is "a standard safety procedure when parole officers conduct a search"); United States v. Turner, No. 21 Cr. 409, 2021 WL 8055692, at *2, *4 (denying motion to suppress involving parolee who was

16

handcuffed during warrantless search). Moreover, given that the Parole Officers suspected that there may be firearms in the home, the Court finds that the precaution of handcuffing a parolee who might have access to a firearm and have sole knowledge of its whereabouts does not exceed the bounds of reasonableness.

Thus, the Court is persuaded that the search of Santana's Residence was rationally and reasonably related to the performance of the Parole Officers' duties under the special needs doctrine, and the search was not unlawful. Accordingly, Santana's Motion to suppress any evidence or contraband seized as a result of the search of his Residence conducted on October 5, 2021 is **DENIED.**

B.    SANTANA'S STATEMENTS MADE TO PAROLE OFFICERS DURING THE SEARCH

Santana argues that statements he made to the Parole Officers during the search of his Residence should be suppressed because they were obtained in violation of the Fifth Amendment and Miranda v. Arizona, 384 U.S. 436 (1966). The Government rebuts that Santana's statements should not be suppressed as they fall within the "public safety" exception to the Miranda warning requirement.

The Fifth Amendment guarantees that "no person . . . shall be compelled in any criminal case to be a witness

17

against himself." U.S. Const. amend. V. Thus, custodial interrogation generally cannot occur before a suspect has been informed of his Miranda rights. These include "the right to remain silent, that any statement [a suspect] makes may be used in evidence against him, and that he has the right to have counsel present." United States v. Mathurin, 148 F.3d 68, 69 (2d Cir. 1998) (citing Miranda, 384 U.S. at 467-71). Inculpatory statements made during custodial interrogation must be suppressed unless police advise the defendant of his Miranda rights and he knowingly, intelligently, and voluntarily waives those rights. See Miranda, 384 U.S. at 444, 479.

Santana argues that he was in custody when he entered the Residence, as he was placed in a chair, handcuffed, and surrounded by Parole Officers while his Residence was searched. The test for determining if one is in custody and therefore subject to Miranda warnings is "whether a reasonable person in the defendant's position would have understood himself to be 'subjected to the restraints comparable to those associated with a formal arrest.'" United States v. Ali, 68 F.3d 1468, 1472 (2d Cir. 1995) (quoting United States v. Mussaleen, 35 F.3d 692, 697 (2d Cir. 1994)). Santana contends that the test is whether "a reasonable person

would not feel at liberty to terminate the interrogation and leave." (Brief at 6 (citing Howes v. Fields, 565 U.S. 499, 509 (2012)). However, the Second Circuit has noted that "a free-to-leave inquiry reveals only whether the person question was seized." Newton, 369 F. 3d at 672. If a reasonable person would not find that he was free to leave, then further analysis is necessary. "In such cases, a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." Id. This standard "instructs [officers] to administer warnings whenever they place a person under formal arrest or apply restraints generally understood as comparable to those of a formal arrest" rather than "requir[ing them] to administer Miranda warnings based on a self-assessment of their actions as 'coercive[.]'" Id.

Here, the Parole Officers handcuffed Santana in order to conduct a search of his Residence, believing that there may be firearms at his Residence. Santana likely would not have felt free to leave both because of the presence of Parole Officers in his home and Police Officers outside of his home, and because he was handcuffed and seated in a chair to allow the Parole Officers to conduct the search. The Court is

persuaded that as presented, the circumstances resemble arrest-like restraints, making it likely that Santana was in custody.

Santana further claims that while in custody, he was improperly interrogated by the Parole Officers without being given Miranda warnings, and that his responses to the questions should therefore be excluded. According to Santana, the Parole Officers asked Santana where he slept, to which he responded that he slept in the living room, and whether the items found under the couch -- two Tupperware containers filled with rice and a scale -- belonged to Santana, to which he responded affirmatively.

The Court notes that the sworn Complaint does not expressly declare that the Parole Officers asked Santana questions about where he slept or about who owned the contraband found under the couch. Instead, the Complaint states that "[a]s the Parole Officers were preparing to search, SANTANA stated to the Parole Officers in sum and substance that he slept in the living room of the Residence." (Complaint ¶ 4.j.) There is no indication that Santana made that statement *in response* to a Parole Officer's question nor does Santana provide an affidavit attesting to that fact. Likewise, the Complaint does not indicate that Santana's

statement that the contraband found under the couch belonged to Santana was in response to a Parole Officer's question nor does Santana swear to that fact in an affidavit. (See id. ¶ 4.l.) However, the Government does not dispute that the officers questioned Santana and concedes the point in its Opposition and Sur-Reply. (See Opp. at 17; Sur-Reply at 5.)

Because Santana was in custody, he posits that he should have been given Miranda warnings prior to any questioning but was not. While the Government does not dispute that Santana was in custody or that the Parole Officers failed to administer Miranda warnings, it argues that Santana's statements should not be suppressed on the ground that the questions and corresponding responses fall under the "public safety" exception to the Miranda requirement. Under the exception, officers may question a defendant without the necessary warnings if it is "necessary to secure their own safety or the safety of the public." Newton, 369 F.3d at 677 (internal quotation marks omitted) (quoting New York v. Quarles, 467 U.S. 649, 658-59 (1984)). Notably, this exception "does not depend upon the subjective motivation of the questioning officer." Id. (citing Quarles, 467 U.S. at 655-56). Instead, for the public safety exception to apply, the questioning must "relate[] to an objectively reasonable

need to protect the police or the public from any immediate danger." Id. at 677-78 (internal quotation marks omitted) (quoting Quarles, 467 U.S. at 659 n.8).

The Court is persuaded that the public safety exception applies here as there was an objectively reasonable need to protect the officers and others present in the Residence from any immediate danger. See id. As a foundational matter, the Parole Officers arrived at Santana's Residence as part of a home visit but also to search the Residence on account of the information that PO-1 received about Santana having been shot. Because the Parole Officers were searching for possible firearms, the object of the search was potentially dangerous to all present in the Residence. It is reasonable to find that the Parole Officers asked Santana about where he slept in order to determine the scope of the premises that needed to be secured and searched for potential firearms. And, the ownership of the contraband was likely relevant to determining whether Santana or another potentially dangerous party had a possessory interest over the evidence and could pose a danger to the Parole Officers or any others at the Residence.

The Government primarily relies on United States v. Estrada to support its argument that the public safety

22

exception applies to Santana's statements. See 430 F.3d 606
(2d Cir. 2005). In Estrada, police officers learned from a
confidential informant that the defendant kept drugs in his
apartment. See id. at 613. After arriving at the defendant's
apartment, the arresting officers handcuffed the defendant
and without giving him Miranda warnings, asked the defendant
whether there were any guns at the residence. See id. The
Second Circuit held that the pre-Miranda warning statements
fell under the public safety exception after considering "the
totality of the circumstances." Id. at 612 (quoting U.S. v.
Reyes, 353 F.3d 148, 152 (2d Cir. 2003)). Specifically, the
Second Circuit considered that the defendant had prior
assault convictions, that if the defendant kept drugs in his
apartment, he also likely possessed a gun, and that there
were others present at the apartment at the time of the
defendant's arrest. See id. at 612-13. The Second Circuit
further highlighted that the question posed by the officer
about whether there were any guns at the apartment was "narrow
in scope, directly targeting the safety concern, and were not
posed to elicit incriminating evidence." Id. at 613.

The Court finds that there are many parallels between
the facts in Estrada and the facts here. Like the defendant
in Estrada, Santana had a prior attempted assault conviction

that involved a weapon, the Parole Officers were searching for possible firearms, though they ultimately did not find any, and there were others present at the Residence, including Acevedo. Though Santana was handcuffed prior to the questioning, his previous attempted assault conviction would give the Parole Officers "reason to believe that [Santana] was capable of violence." Id. Moreover, because the Parole Officers found contraband in the Residence, it would be objectively reasonable for an officer to believe that firearms may also be present. See id. (noting that the defendant "ke[eping] drugs in the apartment gave rise to a reasonable belief that he also kept a gun there"); see also id. (recognizing that "firearms are tools of the drug trade that are commonly kept on the premises of major narcotics dealers"). As Santana was not the only resident of his home, knowing who had a possessory interest in the narcotics would allow the officers to take measures to ensure their own and others' safety in case another individual was present, and potentially had a weapon.

The Court also finds significant that the questions were not necessarily investigatory in nature or "designed solely to elicit testimonial evidence from a suspect," id. at 612 (quoting Quarles, 467 U.S. at 658-69), as they were pointed

24

questions through which the Parole Officers could glean the
scope of the premises to be searched and the people who might
be potentially dangerous in order to secure their own and
others' safety. In Newton, parole officers learned that a
parolee threatened to kill his mother and his mother's husband
and that he kept a gun at their apartment where he was
residing. See 369 F.3d at 663. After arriving at the apartment
to conduct a search, the parole officers handcuffed the
defendant. See id. Without providing Miranda warnings, an
officer then asked the defendant whether he had any
"contraband" in the residence, and the defendant's response
led to the discovery of an automatic firearm. See id. at 663-
64. The Second Circuit held that the question, though asked
without Miranda warnings and broader than the question in
Estrada, fell within the public safety exception because the
question encompassed items like weapons and safety concerns.
See id. at 679. While the question about contraband in Newton
was broad and somewhat imprecise, the Second Circuit
determined that the question clearly encompassed matters
pertaining to public safety.

Unlike Newton, the questions here about where Santana
slept and who owned the narcotics, and Santana's responses to
those questions, were narrow and focused. Though the Parole

25

Officers did not expressly ask about weapons or guns, given the close connection between the narcotics trade and firearms, the answers elicited from the Parole Officers' questions provided information about the scope of the premises that needed to be secured and observed, and the individuals who may be potentially dangerous because of their interest in the contraband discovered. Having considered the totality of the circumstances here, the Court is persuaded that the questions asked by the Parole Officers, and Santana's responses thereto, served an objectively reasonable need to protect others from danger, and were therefore appropriately within the public safety exception. Accordingly, Santana's Motion to suppress his statements during the search of the Residence is **DENIED**.

C.    FRUIT OF THE POISONOUS TREE

Santana argues that because the search of his Residence was unlawful, any secondary evidence seized and statements made during and after the search must be suppressed as "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 488 (1963). Under the "fruit of the poisonous tree" doctrine, "evidence obtained from or as a consequence of lawless official acts" must be excluded. Costello v. United States, 365 U.S. 265, 280 (1961). This exclusionary rule "prohibits the introduction of derivative evidence, both

tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search[.]" <u>Murray v. United States</u>, 487 U.S. 533, 536-37 (1988). If the Government cannot establish that the tangible and testimonial evidence was lawfully seized pursuant to a warrant or a valid exception, then the evidence is considered "fruit of a poisonous tree" and must be excluded at trial. <u>See</u> <u>Wong Sun</u>, 371 U.S. at 488.

Santana argues that because the Parole Officers' search of Santana's Residence violated the Fourth Amendment, any contraband seized and statements made during and after the search must be suppressed. However, as the Court has established that the Parole Officers' search of Santana's Residence was lawful, the fruits of that search, such as further contraband recovered by the officers, including from the search of Santana's vehicle (to which Santana consented), and statements Santana later made at the NYPD precinct after being given <u>Miranda</u> warnings, need not be excluded. Santana's Motion to suppress secondary evidence and statements under the fruit of the poisonous tree doctrine is therefore **DENIED.**

D.   <u>EVIDENTIARY HEARING</u>

Lastly, Santana moves, in the alternative, for an evidentiary hearing to resolve any factual disputes that may exist. The Government opposes the request.

"An evidentiary hearing on a motion to suppress 'ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable a [] court to conclude that contested issues of fact going to the validity of the search are in question.'" <u>United States v. Wallace</u>, No. 97 Cr. 975, 1998 WL 401534, at *9 (S.D.N.Y. July 17, 1998) (quoting <u>United States v. Pena</u>, 961 F.2d 333, 339 (2d Cir. 1992) (internal quotation marks and citations omitted)). However, a defendant "is not automatically entitled to an evidentiary hearing . . . but must make a preliminary showing of facts which, if proved would require the granting of relief." <u>United States v. Ventura</u>, No. 97 Cr. 1251, 1998 WL 186737, at *1 (S.D.N.Y. Apr. 17, 1998). To satisfy this burden, "a defendant must, at a minimum, present his or her claim through an affidavit of an individual with personal knowledge of the relevant facts." <u>Id.</u> (citing <u>U.S. v. Gillette</u>, 383 F.2d 843, 848-49 (2d Cir. 1967)). Where such an affidavit is missing, an evidentiary hearing on a motion to suppress is not warranted. <u>See</u> <u>Wallace</u>, 1998 WL 401534, at

28

*10 (noting that even if a defendant alleged sufficient facts, "it has been established that a court need not resolve factual disputes presented by the moving papers absent a supporting affidavit of someone with personal knowledge of the underlying facts"); United States v. Caruso, 684 F. Supp. 84, 87 (S.D.N.Y. 1988) (same).

Here, the Court is not persuaded that an evidentiary hearing is necessary to resolve Santana's Motion. Despite requesting an evidentiary hearing in his Brief and Reply, Santana failed to provide an affidavit of himself or of someone with personal knowledge of the underlying facts to make a preliminary showing of facts which, if proven to be true, would warrant relief. On this basis alone, an evidentiary hearing should be denied.

However, the Court finds that an evidentiary hearing is unwarranted even if it considered Santana's arguments. Santana contends in his Reply that an evidentiary hearing is necessary to resolve two disputes of material fact: (1) whether the Parole Officers had "specific and articulable facts" justifying the search (Reply at 1) and (2) whether the Parole Officers had a valid safety concern in handcuffing Santana (see id. at 4).

On the first dispute, Santana articulates a more exacting standard than necessary to justify a parole officer's search of a parolee's residence. As the Court addressed above, contrary to Santana's assertion that "specific and articulable facts" are necessary to justify the search, under the special needs doctrine, to determine whether a parole officer's search was lawful, the conduct must be "rationally and reasonably related to the performance of the parole officer's duty," Huntley, 371 N.E.2d at 797, in light of "the special needs animated by management of a parole system." Rivera, 2020 WL 1131140, at *3.

The issues Santana seeks to resolve through an evidentiary hearing are not relevant under the standard articulated by the special needs doctrine. As the Court established, it would be incumbent upon a parole officer whose parolee had been shot, especially if his prior underlying conviction is related to possession of weapons, to do his due diligence and investigate further to determine whether his parolee had been engaging in conduct that may violate his conditions of parole. In turn, a parole officer's failure to inquire or investigate further could conceivably be seen as neglecting his duties as a parole officer. Because the Parole Officers' conduct rationally and reasonably related to their

professional duty, the Court does not find that further fact-finding is necessary.

On the second dispute, Santana argues that a hearing is necessary to determine whether the Parole Officers' belief that there was a public safety concern that justified handcuffing and interrogating Santana was credible and reasonable. Again, here, the Court finds that there is no dispute of material fact. As the Court explained above, it is the standard safety procedure of DOCCS and Parole to handcuff parolees during searches. (See Complaint ¶ 4.i); see also United States v. Brown, No. 22 Cr. 266, 2023 WL 208171, at *9 (S.D.N.Y. Jan. 13, 2023) (crediting testimony of parole officer that "during searches parolees are handcuffed as a matter of DOCCS policy"). Also, because the Parole Officers were searching for possible weapons, it was reasonable to handcuff Santana for fear that he might flee, obstruct the search in some way, or have access to firearms to which the officers were not privy, creating a potentially dangerous situation for those on the premises. Thus, there is nothing inherently unreasonable about Parole handcuffing Santana during the search.

Additionally, the Court finds that there is no dispute as to whether the questioning of Santana fell within the scope

of the public safety exception, rendering the statements elicited from Santana admissible. As the Court explained above, the public safety exception to the <u>Miranda</u> requirement does not rest on an officer's subjective motivations, <u>see</u> <u>Newton</u>, 368 F.3d at 677, but rather on whether the questioning "relate[d] to an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon." <u>Quarles</u>, 467 U.S. at 659 n.8.

The inquiry into where Santana slept and who owned the narcotics are appropriately within the bounds of the public safety exception even without further inquiry and fact-finding. The question pertaining to where Santana slept related to a need to understand the scope of the premises that needed to be secured and the scope of the search to find a potentially dangerous weapon. The question pertaining to the owner of the contraband found under the couch related to a need to protect the officers and others present in the Residence from possible dangers posed by individuals who may have an interest in the narcotics recovered, especially in a residence housing more than one individual and given the close link between narcotics and firearms. The Court is persuaded that there is no need to inquire into the Parole Officers' training, home visits, prior handcuffing, and their

subjective motivations, as these questions are not material to the issue of whether the public safety exception applies. Thus, the Court **DENIES** Santana's request for an evidentiary hearing on the Motion to suppress.

### III. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 34) of defendant José Santana ("Santana") to suppress certain physical evidence and statements is **DENIED** in its entirety; and it is further

**ORDERED** that the motion (Dkt. No. 34) of Santana for an evidentiary hearing is **DENIED**. The Clerk of Court is respectfully directed to terminate any pending motions.


**SO ORDERED.**

Dated:    20 July 2023
          New York, New York

                                              Victor Marrero
                                                U.S.D.J.

33